IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

BYRON CRAIG, JR.,

*Defendant*.

Criminal Action No. ELH-18-0450

## MEMORANDUM OPINION

The self-represented defendant, Byron Craig, Jr., has filed a motion for reconsideration of compassionate release (ECF 298), as well as a motion to modify or terminate his restitution obligation.  ECF 305.   He is currently serving a 70-month sentence at USP Lewisburg for the offense of wire and bank fraud, in violation of 18 U.S.C. § 1349.  Judge Stephanie Thacker, who sat in this Court by designation, presided at Craig's trial.[1]  As part of the sentence, Judge Thacker entered an order of restitution in the amount of $170,837.00, joint and several with four codefendants.

By Memorandum Opinion (ECF 288) and Order (ECF 289) of April 20, 2021, I denied defendant's earlier request for compassionate release (ECF 251).[2]  He has filed a "Motion For Court to Nunc Pro Tunc Reevaluate The Basis Of Its Previous Decision Denying My Request For Compassionate Release Based On Oversights And New Developments".  ECF 298.  Notably,

---

[1] The case was reassigned to Judge Thacker from me on September 6, 2019.  *See* Docket; *see also* ECF 113.  It has since been returned to me.

[2] Craig's first motion for compassionate release was filed by counsel.  *See* ECF 251.  However, ECF 298 was prepared without the assistance of counsel.  And, one month after it was docketed, defense counsel moved to withdraw from this case (ECF 301), which I granted by Order of January 19, 2022.  ECF 302.

Craig contends that his release is warranted at this juncture because he is the sole possible caregiver for his ailing wife.  *See* ECF 298 at 8.  He also claims that he should be released in light of his obesity and the continued danger posed by COVID-19.  *Id.* at 5-7.  Craig has submitted several exhibits to support his motion.  *See* ECF 297; ECF 298-1; ECF 299; ECF 300; ECF 313.  He has also filed a supplement to the motion.  ECF 317.  I shall refer to ECF 298 and ECF 317 collectively as the "Motion."

The government opposes the Motion.  ECF 320.  It argues that the Motion is, in essence, a new motion for compassionate release, subject to administrative exhaustion, which Craig has not satisfied.  Alternatively, it maintains that granting the Motion would be inappropriate because Craig has failed to present an extraordinary and compelling reason for his release.  And, even if Craig has done so, the government argues that his release would be inconsistent with the sentencing factors outlined in 18 U.S.C. § 3553(a).  Craig has replied.  ECF 322.[3]

In addition, Craig has filed a "Motion To Modify Or Terminate Restitution Payment Obligations" (ECF 305), accompanied by a memorandum of law.  ECF 305-1 (collectively, the "Restitution Motion").   Among other things, Craig asserts that the Court failed to make "any factual findings" to support the award of restitution.  ECF 305-1 at 1.  In addition, he claims that he has experienced "material changes" to his "economic circumstances."  *Id.* at 2.  Further, Craig argues that Bureau of Prisons ("BOP") officials have improperly collected restitution payments from his inmate trust account, in violation of the terms specified in the Amended Judgment (ECF 177).  *See* ECF 305-1 at 10-11.

The government opposes the Restitution Motion.  ECF 315.  It also filed a supplement to its opposition, clarifying that the BOP had garnished restitution payments from defendant, in an

---

[3] A duplicate version of ECF 322 was docketed at ECF 324.

amount totaling approximately $950.00.  ECF 319 (the "Supplement").  But, the Supplement provides that the United States Attorney's Office ("USAO") has "consulted with the BOP, and the BOP has indicated that it will no longer garnish restitution payments from Mr. Craig's trust account."  *Id.*  Craig has replied.  ECF 321; ECF 323.[4]

With respect to both the Motion and the Restitution Motion, defendant asks the Court to appoint counsel for him.  *See* ECF 298 at 2; ECF 305-1 at 2.

No hearing is necessary.  For the reasons that follow, I shall deny defendant's request for the appointment of counsel.  Further, I shall deny the Motion and the Restitution Motion, without prejudice.

## I.    Procedural and Factual Background[5]

On January 8, 2019, Craig and four codefendants were charged in a thirty-seven count Superseding Indictment in connection with a bank fraud conspiracy scheme.  ECF 46.  In particular, defendant was charged with conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two through Six, and Ten); bank fraud, in violation of 18 U.S.C. § 1344 (Count Thirteen); fraud/misuse of a social security number, in violation of 42 U.S.C. § 408(a)(7)(B) (Counts Fourteen through Eighteen, Twenty-Two, Twenty-Three); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts Twenty-Six through Thirty, Thirty-Four, Thirty-Five).

---

[4] Duplicates of ECF 319 and ECF 323 were appended to ECF 324 as an exhibit.  *See* ECF 324-1.

[5] Where appropriate, I have drawn on the factual background set forth in my Memorandum Opinion of  April 20, 2021.  ECF 288.

Craig proceeded to trial before Judge Thacker in October 2019.  ECF 127.  After a four day trial, the jury convicted Craig of Count One of the Superseding Indictment.  ECF 139.  He was acquitted of the remaining charges.   *See* ECF 139; ECF 168, ¶ 2.

The evidence at trial showed that Craig organized a scheme to defraud banks and car dealerships.[6]  As part of the scheme, the codefendants acquired the social security numbers of victims, some of whom were minor children, and used the social security numbers and other fraudulent documentation to obtain auto loans.  ECF 168 (Presentence Report or "PSR") at 4-9.  Then, the defendants purchased vehicles with the loans and later resold the vehicles to buyers on Craigslist.  *Id.*  The total intended loss was about $300,000.  *Id.* ¶ 30.

Sentencing was held on January 13, 2020.  ECF 173.  At the time of sentencing, the defendant was 54 years of age. ECF 168 at 3.  He had neither a high school diploma nor a GED.  *Id.* He stood five feet, six inches tall and weighed about 205 pounds.  *Id.* ¶ 89.

Defendant reported that when he was fourteen years of age, he was severely beaten and thrown over a bridge, for which he was hospitalized for five days.  *Id.* ¶ 90. When the defendant was sixteen, he was shot in the head by someone who mistook him for his brother.  *Id.* ¶ 91. And, when defendant was 35, he was again shot by someone who mistook him for his brother.  *Id.* ¶ 93.

According to the PSR,  Craig had a final offense level of 27 for Count One.  *Id.* ¶ 45.  And, he had a total of six criminal history points.  *Id.* ¶ 54.  This resulted in a Criminal History Category of III.  *Id.*  Based on a final offense level of 27 and a Criminal History Category of III, the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") called for a term of imprisonment ranging from 87 to 108 months.  *Id.* ¶ 110.

---

[6] The facts set forth here derive from the Presentence Report.  *See* ECF 168.  A prior version of the PSR was docketed at ECF 158.  Excerpts of trial proceedings are docketed at ECF 151, ECF 152, ECF 153, ECF 154, and ECF 155.

Judge Thacker sentenced the defendant to a below-Guidelines sentence of 70 months in prison, followed by five years of supervised release. ECF 174 (Judgment); *see also* ECF 177 (Amended Judgment). Defendant was allowed to surrender to the BOP on March 16, 2020. ECF 177 at 2. In addition, Judge Thacker ordered restitution in the amount of $170,837.00, joint and several with the codefendants. *Id.* at 5.

Of import here, the Amended Judgment specified that payment shall be due "[i]n full immediately." *Id.* at 6. But, it also provided that "[n]o restitution or other financial penalty shall be collected through the Inmate Financial Responsibility Program." *Id.* (emphasis omitted). The Court notes that the Inmate Financial Responsibility Program (the "IFRP") is "a work-program instituted by [BOP] to encourage 'each sentenced inmate to meet his or her legitimate financial obligations.' The program provides for development of a financial plan that allows inmates to pay certain enumerated obligations, including court-ordered assessments, restitutions, and fines." *Montano–Figueroa v. Crabtree,* 162 F.3d 548, 548 (9th Cir.1998) (per curiam) (quoting 28 C.F.R. § 545.10), *cert. denied,* 526 U.S. 1091 (1999).

Significantly, no appeal was filed by Craig, either as to the sentence or the amount of restitution.

Craig, who is now 56 years of age, began serving his sentence at FCI Schuylkill. ECF 253 at 3; *see* ECF 253-1. In April 2020, defendant submitted a request to the Warden for compassionate release. ECF 253 at 3; ECF 253-1. His request was denied. ECF 253-1.

Thereafter, on November 24, 2020, Craig filed a motion for compassionate release with this Court. *See* ECF 251; ECF 253. Relevant here, the motion asserted that defendant's obesity rendered him particularly vulnerable to COVID-19 and thus constituted an extraordinary and compelling reason for his release. ECF 253 at 2.

The Court denied the motion by Memorandum Opinion (ECF 288) and Order (ECF 289) of April 20, 2021. Although I found that, in light of the COVID-19 pandemic, defendant's obesity amounted to an extraordinary and compelling for his release, I determined that his release would be inconsistent with the sentencing factors outlined in 18 U.S.C. § 3553(a). ECF 288 at 15-18 Thus, I denied the motion, without prejudice. *Id.* at 18; *see* ECF 289.

In the interim, on April 1, 2021, Craig was transferred to Lewisburg USP. *See* ECF 298 at 5; ECF 320 at 3; *see also Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed May 13, 2022).[7] Eight months later, in December 2021, Craig submitted several filings to the Court, asking the Court to reconsider its denial of his motion for compassionate release. *See* ECF 297; ECF 298. He later supplemented those filings. *See* ECF 299; ECF 300; ECF 313; ECF 317. There is no indication, however, that Craig ever submitted a request to the Warden of USP Lewisburg for his release.

Principally, defendant argues that his release is warranted so that he can care for his wife, who was diagnosed with a brain aneurysm. ECF 298 at 12-14. According to a letter dated March 11, 2022, from a Certified Registered Nurse Practitioner at the University of Maryland Faculty Physicians, Inc., surgery was anticipated "in the next few weeks to months." ECF 317 at 4; *see* ECF 313 (same). Craig also claims that his continued incarceration poses a risk of severe illness to him, in light of his obesity and the ongoing COVID-19 pandemic. ECF 298 at 5-7.

Moreover, Craig has asked the Court to "modify or terminate the erroneous restitution payment obligations the court imposed upon him." ECF 305-1 at 1. He asserts that the amount of restitution has no relation to the loss incurred by the victims. *Id.* at 1-2. In addition, defendant

---

[7] The parties have not supplied the Court with documentation corroborating the date on which defendant's transfer occurred. But, Craig asserts that he was transferred on April 1, 2021 (ECF 298 at 5), and the government has not disputed the assertion.

claims that the restitution order should be modified in light of his changing economic circumstances.  ECF 305-1 at 2.  And, Craig argues that the BOP has garnished restitution payments from him, in violation of the terms of the Amended Judgment.  *Id.* at 11.

According to the BOP, the defendant has a projected release date of  March 5, 2023.  *See Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed May 13, 2022).   To date, he has been incarcerated for about 26 months, or approximately 37% of the sentence initially imposed.

## II.      Appointment of Counsel

As mentioned, Craig asks the Court to appoint counsel for him to assist in litigating the Motion and the Restitution Motion.  *See* ECF 298 at 2; ECF 305-1 at 2.  But, there is no constitutional right to appointed counsel in post-conviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").  Rather, the determination to appoint counsel in this context rests solely within the discretion of the district court. *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Craig urges the appointment of counsel because he is indigent.  *See* ECF 298 at 2; ECF 305-1 at 2.  However, Craig has proven more than capable of articulating the legal and factual basis of his claims.  Moreover, he has not identified any exceptional circumstances that warrant the appointment of counsel.  Therefore, I shall deny defendant's request, without prejudice.

## III.      Motion

### A.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United*

*States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C.        § 3582(c)(1)(B);        *see        Jackson*,        952        F.3d        at        495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194.  This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step

Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the

defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[8]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that

---

[8] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

compassionate release may be  based on  circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G.  § 1B1.13 App. Notes 1(A)-(D).  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).  However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c).  *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that,

even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

## B.  COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[9]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of May 13, 2022, COVID-19 has infected more than 82 million Americans.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed May 13, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the

---

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In May 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to

severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Particularly at the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg.*

*Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.

Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[10]

---

[10] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[11] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 29% of people from ages 5 to 11, 59% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 91% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited May 13, 2022).

Moreover, approximately 101.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 15, 2022). And, federal regulators recently approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important'*

---

[11] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

*for higher risk people*, ABC News (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of May 13, 2022, the BOP had 138,385 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 316,729 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed May 13, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. Times, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, Ctrs. for Disease Control and

PREVENTION,  https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html  (updated

Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous

variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*,

WALL ST. J., Nov. 1, 2021,  https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-

leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious

toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily

averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What

to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August

14, 2021, "[i]nfections have spiked to the highest levels in six months").

    After the Delta variant, the Omicron variant emerged, both around the world and in the

United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron

Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13,

2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See,

e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN

(Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

    Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S.

coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7,

2022),        https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-

updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to

normalcy.

Nevertheless, we have once again begun to experience a surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. Indeed, a new subvariant of the virus is "spreading rapidly and will probably become the dominant form of the virus in the United States in the next few weeks." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ."  Amelia Nirenberg, *A Coming Fall Surge?*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

As of May 13, 2022, the BOP reported that 111 federal inmates, out of a total population of 138,385, and 195 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19. Moreover, 51,879 inmates and 12,628 staff have recovered from the COVID-19 virus. In addition, 295 inmates and seven staff members have died from the virus. The BOP has completed 128,724 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP Lewisburg, where the defendant is imprisoned, the BOP reported that as of May 13, 2022, out of a total of 1,175 inmates, zero inmates or staff have tested positive, one inmate has died of COVID-19, and 346 inmates and 171 staff have recovered at the facility. In addition, 292 staff members and 1,108 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/bmp/ (last visited May 13, 2022).

23

## C.  Discussion

In the Motion, defendant argues that the Court should grant him compassionate release for two reasons.  First, he claims that, in light of his obesity, the ongoing COVID-19 pandemic poses a risk to his health.  ECF 298 at 5-7, 14.  Second, he claims that he should be released from prison so that he may care for his ailing wife.  *Id.* at 8, 12-13.  Specifically, defendant asserts that Ms. Craig has recently suffered a brain aneurysm, for which she will undergo surgery in the near future.  ECF 298 at 12-14; *see* ECF 317 at 1-2, 4.  According to Craig, the surgery will render his wife incapacitated, and he is her sole possible caregiver.  ECF 298 at 13; ECF 322 at 12.

In response, the government maintains that the Court should deny the Motion for failure to exhaust.  ECF 320 at 3-6.  Further, it claims that defendant has failed to present an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A).  *Id.*  at 6-11. And, the government asserts that the sentencing factors set forth in 18 U.S.C. § 3553(a) militate against Craig's release.  *Id.* at 11-13.

## 1.

As a preliminary issue, the government argues that Craig has failed to satisfy the exhaustion requirements of the compassionate release statute.  ECF 320 at 3-6.  Specifically, it states that although styled as a motion for reconsideration of the Court's previous decision, the Motion is, in effect, a successive, distinct motion for compassionate release.  *Id.* at 3.  Thus, in the government's view, defendant was required to raise the assertions contained within the Motion in a request to the BOP, before submitting them to this Court.  *Id.* at 4-5.

It is not entirely clear whether defendant contests the government's characterization of the Motion as a new motion for compassionate release.  ECF 322 at 1-2.  But, in any case, to the extent that the Court construes the Motion as a new motion for compassionate release, Craig argues that

the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A) is non-jurisdictional. *Id.* at 3-5. Thus, in his view, if the Court finds that he failed to exhaust his administrative remedies with respect to the Motion, his failure to adhere to this requirement should be excused. *Id.* at 6-8.

In my view, the government correctly characterizes the Motion as a new motion for compassionate release. To be sure, the Motion is styled as one for reconsideration with respect to the Court's earlier denial of defendant's first motion for compassionate release. *See* ECF 298. But, the label is not determinative; it is the substance that controls.

As mentioned above, before Craig filed his first motion for compassionate release, he submitted two requests for his release to the Warden of the facility where he was then incarcerated, based on his vulnerability to COVID-19. *See* ECF 253-1. The requests were promptly rejected. *See id.* Thereafter, in November 2020, Craig moved the Court for compassionate release. *See* ECF 251; ECF 253. The Court denied the motion in April 2021. *See* ECF 288; ECF 289.

Approximately eight months later, in December 2021, Craig filed the Motion at issue, without submitting a request for compassionate release to the Warden of the facility where he is now imprisoned. *See* ECF 298. Moreover, as the government points out (ECF 320 at 4-5), the Motion raises issues that were not previously brought to the BOP's attention, *i.e.*, defendant's need to care for his wife and his continued vulnerability to COVID-19. *See* ECF 298 at 5-8, 12-15. Thus, I am persuaded that the Motion is, in all but name, a new motion for compassionate release. *See United States v. Godwin*, 1:17-cr-00008-MR-WCM-1, 2021 WL 3072465, at *1 (W.D.N.C. Jul. 20, 2021) (explaining that although "the Defendant style[d] her motion as one for reconsideration, she filed it eight months after the Court denied her motion for compassionate release" and "raise[d] entirely new grounds for relief, including the worsening of her medical

conditions in recent months"; thus, the motion constituted "a new motion for compassionate release and not just a motion for reconsideration of the Court's prior Order").

Given that the Motion is functionally a new motion for compassionate release, I must next determine whether defendant was required to exhaust his administrative remedies prior to filing the Motion.

As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

The Fourth Circuit has also reiterated that the exhaustion requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. *Muhammad*, 16 F.4th at 130. This means that it can be "waived if it is not timely raised." *Id*. at 129. Here, however, the government has raised it. *See* ECF 320 at 3-6.

As best I can determine, the Fourth Circuit has not conclusively resolved whether a defendant must independently satisfy the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A) prior to filing a successive motion for compassionate release. But, at least one federal circuit court has indicated that each compassionate release motion must independently satisfy the exhaustion requirement. *See United States v. Keller*, 2 F.4th 1278, 1283 (9th Cir. 2021)

("But the July 2020 request served as the predicate for [the defendant's] first motion in the district court, which was denied in September 2020, and could not have initiated the administrative process for his January 2021 motion, which was itself premised on [the defendant's] claim of changed circumstances.").

Other district court decisions are to like effect. *See*, *e.g.*, *United States v. Ramirez*, 14-cr-00249-PAB-2, 2022 WL 1092180, at *3 (D. Colo. Apr. 12, 2022); *United States v. Coe*, 1:18-CR-59-HAB, 2022 WL 704920, at *1 (N.D. Ind. Mar. 8, 2022); *United States v. Ezukanma*, 3:15-CR-0254-B-1, 2021 WL 389827, at *2 (N.D. Tex. Feb. 4, 2021); *United States v. Cain*, 1:16-cr-00103-JAW-1, 2021 WL 388436, at *4-5 (D. Me. Feb. 3, 2021). Indeed, judges within this Circuit have reached the same conclusion. *See*, *e.g.*, *United States v. Huitt*, 3:16-cr-206-MOC, 2021 WL 2226486, at *2 (W.D.N.C. Jun. 2, 2021) (collecting cases). As Judge Cogburn explained: "[The exhaustion] requirement serves an important purpose: it 'provide[s] BOP with the first opportunity to evaluate a prisoner's request,' consistent with Congress's determination that 'BOP, not the Court, is better positioned to first evaluate a defendant's request and consider whether modification of a term of imprisonment is appropriate.'" *Id.* at *2 (quoting *United States v. Beahm*, 1:05-CR-249, 2020 WL 4514590, at *1 (E.D. Va. Aug. 5, 2020) (alteration in *Huitt*). Thus, "[c]onstruing the exhaustion requirement as motion-specific is consistent with § 3582(c)(1)(A)'s plain language and statutory framework." *Huitt*, 2021 WL 2226486, at *2 (citing *Cain*, 2021 WL 388436, at *4).

In sum, I conclude that because Craig raises at least one new ground for compassionate release, which was not previously raised in his earlier Motion, he was first required to submit his request to the Warden of the facility where he is incarcerated before filing a successive motion for compassionate release. *See Muhammad*, 16 F.4th at 130; *see also* 18 U.S.C. § 3582(c)(1)(A).

27

Notably, Craig does not contend that he satisfied this administrative prerequisite before filing the Motion.  Rather, he contends that, to the extent that the Court's review of the Motion is precluded by his failure to exhaust, the Court should excuse the exhaustion requirement on equitable grounds.  ECF 322 at 5-8.  He states that "the relief sought would be futile upon exhaustion"; "exhaustion via the agency review process would result in inadequate relief"; and "pursuit of agency review would subject [him] to undue prejudice."  *Id.* at 6.

Although the Fourth Circuit has said that the administrative exhaustion requirement may be waived if not asserted by the government, it has not addressed whether the requirement is subject to equitable principles, such as futility. *See, e.g.*, *Nutraceutical Corp. v. Lambert*, ____U.S. ____, 139 S. Ct. 710, 714 (2019) ("Though subject to waiver and forfeiture, some claim-processing rules are 'mandatory'—that is, they are 'unalterable' if properly raised by an opposing party . . . . Whether a rule precludes equitable tolling turns not on its jurisdictional character but rather on whether the text of the rule leaves room for such flexibility.") (internal quotation marks and citation omitted); *United States v. Marsh*, 944 F.3d 524, 529-30 (4th Cir. 2019) (same).

Several other circuits have concluded that § 3582(c)(1)(A) imposes a mandatory claim-processing rule not subject to equitable waiver.  *See*, *e.g.*, *United States v. Houck*, 2 F.4th 1082, 1084 (8th Cir. 2021); *United States v. Johnson*, 849 F. App'x 750, 753 (10th Cir. 2021); *United States v. Alam*, 960 F.3d 831, 835 (6th Cir. 2020). And, judges in this District have generally reached the same conclusion.  *See United States v. Johnson*, 451 F. Supp. 3d 436, 440 (D. Md. 2020); *United States v. Maycock*, GLR-14-0133, 2020 WL 2395620, at *2 (D. Md. May 12, 2020); *United States v. Osagbue*, PX-19-448, 2020 WL 1939713, at *1 (D. Md. Apr. 22, 2020); *United States v. Underwood*, TDC-18-0201, 2020 WL 1820092, at *2-3 (D. Md. Apr. 10, 2020).

But, I am aware of one case in this District in which the Court has waived the exhaustion requirement on the ground of futility. *See United States v. Barringer*, PJM-13-0129, 2020 WL 2557035, at *2-3 (D. Md. May 19, 2020).  That case concerned a unique circumstance not present here: the defendant was designated to one prison but had not yet been transferred and remained in the custody of the U.S. Marshal Service, meaning there was no BOP warden to whom he could submit a request.  *Id*.

In sum, the weight of authority suggests that futility, undue prejudice, and inadequacy of agency review are not available exceptions to the compassionate release statute's exhaustion requirement.  Thus, as I see it, these grounds would not excuse Craig's failure to comply with the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

**2.**

Out of an abundance of caution, I shall consider the Motion on the merits.  Therefore, I first determine whether defendant has presented the Court with an extraordinary and compelling reason for his release.

As mentioned, defendant primarily argues that he is eligible for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that he is the only "available care taker and caregiver for [his] ailing and incapacitated wife, . . . who is currently suffering from a massive – aneurysm or stroke to the brain."  ECF 298 at 12.  He claims: "Having no full medical insurance, my wife has been sent home to our house to take care of herself alone, albeit she have [sic] speech impairments and difficulty bathing and feeding herself and taking care of basic needs to survive." *Id.* at 12-13.  And, according to defendant, "[t]here is absolutely no one readily available who can accommodate her needs and fulfill these voids.  Temporary visits are made by other family

members who's [sic] demands of their personal lives prevent them from fully taking care of her properly." *Id.* at 13.

Notably, defendant submitted two letters from Ms. Craig's medical providers, providing some background on her medical condition. *See* ECF 298-1 at 17; ECF 317 at 4. The first letter, dated March 5, 2021, was signed by Ms. Craig's attending physician at the University of Maryland Medical Center and her social worker. ECF 298-1 at 17. It indicates that Ms. Craig was hospitalized on February 28, 2021, "after experiencing a subarachnoid hemorrhage and right inferior frontal lobe intracerebral hemorrhage secondary to 5 mm ACOMM aneurysm." *Id.* The letter also provides: "She is now status post coil embolization of her aneurysm. Her condition is critical, and she continues to require the level of care provided in the NeuroCritical Care Unit."[12] *Id.* And, according to the letter, upon her release, Ms. Craig was going to require "24/7 support at home to accomplish personal care tasks, activities of daily living, and to regain functioning." *Id.*

The record does not reflect when Ms. Craig was released from the hospital or the amount of time that Ms. Craig required to recover from this medical episode. Notably, however, Ms. Craig's hospitalization and the subsequent period of recovery took place during defendant's term of imprisonment.

The second letter, dated March 11, 2022, was signed by Ms. Craig's nurse practitioner. ECF 317 at 4. It indicates that Ms. Craig is a patient "at the University of Maryland Medical Center for brain aneurysm and aneurysm rupture" *Id.*[13] And, the letter provides that a "[r]ecent

---

[12] The parties do not explain the import of this terminology. But, it appears that, Ms. Craig required surgery to recover from this medical episode. *See* ECF 320 at 9; ECF 322 at 12.

[13] Although it is not expressly indicated in the record, these medical conditions are presumably related to the medical episode that Ms. Craig previously experienced, as described in the letter of March 5, 2021. ECF 298-1 at 17.

follow-up revealed aneurysm residual filling." *Id.*  As a result, Ms. Craig will require a "future craniotomy or surgical repair," which is scheduled to occur "in the next few weeks to months." *Id.*  And, the letter asserts that Ms. Craig said that "her husband is her only possible support person to assist her during recovery."  *Id.*

Ms. Craig also submitted a letter to the Court.  ECF 300.  She wrote, in relevant part, *id.*:

> I have never been a sick person in my life now things are happening that I never would have imagined after having a stroke and brain aneurysm and Byron not being here my kids had to make all the major decisions concerning my health.  I just wish that he could be here to help me with everything.

The government argues that defendant's evidence is insufficient to demonstrate Craig's eligibility for compassionate release.    ECF 320 at 9-10.   In particular, it maintains that "Undersigned counsel contacted the nurse" who drafted the letter dated March 5, 2022.  *Id.* at 9.  She purportedly told government's counsel "that Mrs. Craig's recovery period would range from between two and six weeks, after which time she would be able to return to work."  *Id.*[14]

Further, the government points out that, according to the PSR, Ms. Craig has available family support beyond defendant.  *Id.* at 9-10.  Specifically, the PSR reflects that Ms. Craig and defendant "were married in 2014, but at some point, separated, apparently due to the Defendant's mental abuse."  *Id.* at 9-10 (internal quotation marks omitted); *see* ECF 168, ⁋ 80.  And, the government notes that "Mrs. Craig was living with her mother at the time the [PSR] was written (although [she] and the Defendant apparently have since reconciled)."  ECF 320 at 10.   Further, the government urges the Court to consider the fact that Ms. Craig "has two daughters, who are approximately 22 and 29 years old today."  *Id.*; *see* ECF 168, ⁋ 80.

---

[14] The government did not submit an affidavit from the nurse.

At bottom, the government argues that the Motion should be denied because Ms. Craig's condition does not warrant defendant's release.  ECF 320 at 10.  It points out that Ms. Craig "already has navigated a similar period of recovery without the Defendant's assistance after her first surgery in March 2021, and the Defendant fails to explain why his presence is required therefore after her upcoming surgery."  *Id.*  And, Ms. Craig "has available to her at least her mother and two adult daughters."  *Id.*  Thus, the government concludes that although Craig "has demonstrated that Mrs. Craig will require assistance while she recovers, he has not demonstrated that he is the only person who can provide her with that assistance."  *Id.*

In reply, defendant indicates that Ms. Craig's upcoming surgery will be her second, which, according to defendant, implies "that her health is continuing to deteriorate."  ECF 322 at 12. Accordingly, Craig states: "With a second surgery on the way, her recovery process will take longer than her first recovery.  She is now of age – 45 and her body chemistry is not strong [sic] as before."  *Id.*  Thus, he claims that his "physical presence is needed more than ever before."  *Id.*

And, Craig claims that the government's assertions concerning Ms. Craig's family circumstances are misplaced, because "[t]he wife the government referred to in its opposition . . . appears to be [his] second wife," as "she is Mr. Craig's only wife who once live [sic] with her mother."  *Id.* at 12.  Further, defendant states that he has never been separated from Ms. Craig.  *Id.* Thus, he reasserts that he is "undoubtedly her [only] caregiver and the government has not presented any proof or evidence to the contrary."  *Id.* at 13 (brackets in original).

As discussed earlier, the Fourth Circuit has instructed: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *Taylor*, 820 F. App'x at 230 (citing 18 U.S.C. § 3582(c)(1)(A)).  And, relevant here, the commentary to

U.S.S.G. § 1B1.13 provides that "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" may constitute a compelling reason for the defendant's release.  U.S.S.G. § 1B1.13 cmt.1(C)(ii).

But, in the absence of evidence that an inmate is the sole available caregiver for his or her incapacitated spouse, district courts typically find that the inmate's family circumstances do not amount to an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A).  *See*, *e.g.*,  *United States v. Johnson*, 13-00082 (KSH), 2021 WL 3260847, at \*4 (D.N.J. Jul. 29, 2021); *United States v. Tucker*, 3:14-CR-0367-B-84, 2021 WL 977100, at \*1 (N.D. Tex. Mar. 15, 2021); *United States v. Tyler*, Crim. No. 09-391, 2021 WL 736467, at \*4 (E.D. La. Feb. 25, 2021); *United States v. Bolden*, CR-16-320-RSM, 2020 WL 4286820, at \*5 (W.D. Wash. Jul. 27, 2020).

BOP Program Statement § 5050.50(6) provides additional guidance.  In particular, it defines "incapacitation," within the meaning of U.S.S.G. § 1B1.13 cmt.1(C)(ii), as follows:

- [A] serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse or registered partner is completely disabled, meaning that the spouse or registered partner cannot carry on any self-care and is totally confined to a bed or chair; or

- A severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's or registered partner's mental capacity or function), but may not be confined to a bed or chair.

Notably, "courts typically grant compassionate release due to family circumstances in extremely exceptional circumstances such as terminal illness or where a spouse is 'completely unable to care for himself or herself.'"  *United States v. Peuse*, 17-CR-00598-LHK, 2020 WL 5076356, at \*5 (N.D. Cal. Aug. 24, 2020) (citation omitted); *see*, *e.g.*, *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (finding that the condition of defendant's mother constituted

an extraordinary and compelling reason for his release where there was evidence that defendant's mother was "both incredibly unwell, and ha[d] been for some time, and that whatever assistance she [was] receiving from home health aides [was] inadequate"); *United States v. Walker*, 1:11-CR-270, 2019 WL 5268752, at *3 (N.D. Ohio Oct. 17, 2019) (granting compassionate release to defendant to care for his terminally ill mother).

The record does not clearly establish whether Ms. Craig's medical condition qualifies her as incapacitated. To be sure, the letter from Ms. Craig's nurse practitioner indicates that she has a serious health condition, and by now she either has had surgery or will soon undergo surgery. ECF 317 at 4. Although Ms. Craig "states that her husband is her only possible support person to assist her during recovery" (ECF 317 at 4; *see* ECF 300), there is no indication that the surgery will render Ms. Craig wholly incapable of caring for herself. Moreover, although defendant claims that Ms. Craig's recovery process will be a protracted one (ECF 322 at 12), he has not contradicted the government's hearsay assertion that Ms. Craig is expected to be well enough to return to work within six weeks of her surgery, at the latest. *See* ECF 320 at 10. Thus, it does not appear that Ms. Craig will be in need of help for a lengthy period. *See id.* at 9.

Perhaps more important, the record does not establish that defendant is Ms. Craig's only possible caregiver. *See Hamilton*, 715 F.3d at 337 (establishing that defendant, as the moving party, bears the burden of establishing that he is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)); *Edwards*, 451 F. Supp. 3d at 565 (same). In particular, defendant does not offer any evidence to show that Ms. Craig's mother or daughters are unavailable to support her during her period of recovery. Indeed, defendant indicated in the Motion that "other family members" have previously been able to render assistance to Ms. Craig, at least on an intermittent basis. ECF

298 at 13.  And, consistent with that claim, Ms. Craig appears to claim that following her stroke and brain aneurysm, her "kids [made] all the major decisions concerning [her] health."  ECF 300.

In sum, defendant has failed to demonstrate that he is the only possible caregiver for Ms. Craig.  Thus, in my view, defendant has failed to establish an extraordinary and compelling reason for his release on the basis of his family circumstances.

**3.**

Nevertheless, in light of the COVID-19 pandemic, defendant's health conditions render him eligible for compassionate release.  As discussed in my Memorandum Opinion of April 20, 2021 (ECF 288 at 15-16), defendant previously provided the Court with copies of his medical records.  These reflect that as of July 7, 2020, Craig suffered from obesity, with a BMI of 33.9.  ECF 253 at 8; *see* ECF 253-2 (medical records) at 44.  However, the Court has not been presented with any evidence concerning defendant's current weight.  But, in the Motion, defendant indicates that he has a BMI of at least 30.  ECF 298 at 4.  According to the CDC, this renders him obese.  *See Certain Medical Conditions*, *supra*.

To be sure, the CDC  has identified obesity as an underlying health condition that "can make you more likely to get very sick from COVID-19."  *Id.*  Further, defendant is now 56 years of age.  ECF 168 at 3.  And, the CDC has provided: "Older adults are at highest risk of getting very sick from COVID-19."  *See Certain Medical Conditions*, *supra*.

The government does not contest that defendant is obese or that obesity, generally speaking, renders an individual more vulnerable to COVID-19.  Rather, the government indicates that Craig is no longer at risk from COVID-19 because the rate of transmission of COVID-19 in BOP facilities has slowed; defendant was previously infected with COVID-19 and did not suffer severe symptoms; and defendant has been fully vaccinated against COVID-19.  ECF 320 at 7-8.

However, the government has failed to provide the Court with any documents to corroborate its claims.

In any event, assuming the accuracy of the government's contentions, the fact that Craig has been fully vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *Spriggs*, 2021 WL 1856667, at *3. As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

Moreover, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CNTRS. FOR DISEASE CONTROL, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022). Indeed, a recent analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave." Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, WASH. POST (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 12 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series. *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL, https://bit.ly/3MdQMM6

(last updated May 6, 2022).  Moreover, all adults ages 50 years and older are eligible for a second booster shot.  *See id.*  And, the parties have not indicated whether Craig has received a booster shot.

Several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status.  *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

In addition, a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity."  *See also United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

In light of the foregoing, I shall assume, for present purposes, that defendant continues to suffer from underlying health conditions that would render him eligible for compassionate release, in light of the COVID-19 pandemic.  Nonetheless, the Motion fails.

**4.**

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186.   These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id.*

Defendant's crime was a serious one.  As set forth in the Amended Presentence Report, Craig "organized a scheme to defraud banks and car dealerships by procuring cars financed using the social security numbers (SSNs) of others, which [he] would keep for his or a coconspirator's personal use or sell on the website Craigslist."  ECF 168, ¶ 7.  The offense took place over the course of several months, and defrauded various car dealerships and financial institutions in the total amount of approximately $300,000.  *See id.* ¶¶ 8-29, 30.

Craig claims that his time served to date adequately reflects the seriousness of his offense, and he notes that, accounting for good time credit, he has served more than half of his sentence.  ECF 298 at 11.  But, Craig has served only 37% of the sentence that this Court initially imposed.  ECF 177 (Amended Judgment).  And, his sentence was well below the range contemplated by the Guidelines.  ECF 168, ¶ 110.  Defendant has served only about 26 months of imprisonment for his

leadership of a wide-ranging criminal conspiracy.  In my view, a sentence of this length does not adequately reflect the seriousness of defendant's crime nor promote respect for the rule of law.

Further, defendant's criminal history is disturbing.  As discussed in my prior Memorandum Opinion (ECF 288 at 17-18), in 1995, Craig was previously convicted of two counts of theft, in a case where he was also charged with theft of two cargo vans, replacing the vehicles' identification number plates, and collecting the proceeds from a false claim with his insurance company. ECF 168, ¶ 50.  He was sentenced to 8 years' imprisonment, all suspended. *Id.*

Thereafter, in 1998, defendant was convicted in federal court of making a false statement on a tax return related to his role in a scheme to obscure or launder the assets of drug dealers by acquiring luxury cars for them in his name, and then making the loan payments.  *Id.* ¶ 51. Judge Blake sentenced him to probation. *Id.* Supervision was terminated as unsatisfactory. *Id.* Then, in 2003, defendant was convicted in federal court of conspiracy to launder monetary instruments in a scheme in which he accepted the proceeds of drug dealers and issued payroll checks from his company, obscuring the origin of the funds.  *Id.* ¶ 52.  He was sentenced by Judge Blake to 21 months' incarceration. *Id.*

In sum, a review of Craig's criminal history makes plain that the criminal justice system has repeatedly treated defendant with leniency.  Yet, that did not deter him from engaging in the criminal activity that led to his federal prosecution in this case.

Significantly, Craig has submitted numerous records that document the laudable efforts he has made to rehabilitate himself while incarcerated.  *See* ECF 297; ECF 298-1 at 13-16; ECF 299. In particular, defendant notes that he has not incurred any disciplinary infractions during his tenure of imprisonment.  ECF 298 at 9; *see* ECF 298-1 at 14-16 (disciplinary record).  And, he points out

that, according to BOP records, he poses a low  risk of recidivism.  ECF 298 at 10; *see* ECF 298-1 at 13  (defendant's PATTERN worksheet summary).[15]

Moreover, Craig urges the Court to consider  the rehabilitative programming in which he has engaged.  ECF 298 at 8-9; *see* ECF 297; ECF 298-1 at 1-3, 8-12; ECF 299.  Most saliently, on January 3, 2022, Craig was provided with a certificate indicating that he completed the residential portion of the Residential Drug Abuse Program ("RDAP").  *See* ECF 299; *see also* ECF 298-1 at 4-6 ("Progress Notes" recorded during defendant's participation in RDAP).  Further, defendant is currently in the process of completing the coursework necessary to obtain his GED.  *See* ECF 298-1 at 1-3.

Additionally, defendant asserts that he has a "verified re-entry plan and a means of employment that will prevent recidivism and maximize public safety . . . ."  ECF 298 at 8.  But, defendant does not specify the details of this plan in the Motion.

---

[15] On July 19, 2019, the Department of Justice released a risk assessment tool, known as PATTERN, as required by 18 U.S.C. § 3632(a).  *The Attorney General's First Step Act Section 3634 Annual Report*, OFF. OF THE ATT'Y GENERAL, DEP'T OF JUSTICE, https://bit.ly/3EDlDhc (December 2020), 4 [hereinafter 2020 Annual Report].  Among other things, PATTERN was designed to evaluate "the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism," as well as to "reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison."  18 U.S.C. §§ 3632(a)(1), (4).

Accordingly, by January 15, 2020, "PATTERN recidivism risk assessment levels of High, Medium, Low, or Minimum were assigned to all sentenced inmates at BOP designated facilities." 2020 Annual Report, *supra*, at 7.  And, as described in the Attorney General's Annual Report, "a review of each inmate's recidivism risk score is conducted at his or her regularly scheduled Program Review," which occurs "every 180 days throughout the inmate's term of incarceration, or every 90 days once the inmate has less than a year to serve on his or her sentence."  *Id.* at 30-31.

In Craig's prior motion for compassionate release, he stated: "If released, Mr. Craig would be able to reside with his wife in Baltimore" or, in the alternative, "he could return to live with his sister as he did prior to reporting to the Bureau of Prisons." ECF 253 at 16. Also in his prior motion, Craig stated that he "held employment with the Baltimore Sun for decades and could resume employment there if released and permitted to work." *Id.* But, it is not clear whether this plan remains viable, particularly in light of the noted health issues that defendant's wife is experiencing. *See* ECF 298 at 13-14; *see also*; ECF 300; ECF 313; ECF 317 at 4.

The Court applauds Craig for his positive efforts to return to society. But, "rehabilitation alone cannot serve as a basis for compassionate release." *Davis*, 2022 WL 127900, at *1. And, in this case, the Court remains troubled by the severity of defendant's offense of conviction, coupled with his criminal history, and the abbreviated duration of incarceration that defendant has served to date. Thus, the Court denies the Motion, without prejudice.

### IV.    Restitution Motion

In the Restitution Motion, Craig argues that the Court should modify or otherwise terminate the restitution ordered by Judge Thacker. ECF 305-1 at 1-2. Moreover, he complains that the BOP has improperly garnished restitution payments from his inmate trust account, in violation of the terms of the Amended Judgment. *Id.* at 11.

### A.

Craig has asked the Court to "modify or terminate the erroneous restitution payment obligations the court imposed upon him in the amount of $170,837.00—jointly with four other co-defendants." ECF 305-1 at 1. To that end, he contends, *id.* at 1-2: "The sentencing record is completely devoid with [sic] whether the court made any factual findings as to the apportion of restitution imposed in relation to the specific losses, victims, and Mr. Craig's ability to pay.

Moreover, the restitution order was not based on a determination of each identifiable victim's losses; notwithstanding the fact that [all] the alleged victims had not been identified before or within 90-days after sentencing as required by law." (Brackets in original). Further, Craig claims that "[r]ecent material changes in [his] economic circumstances has affected his ability to pay the restitution imposed at present and in the future." *Id.* at 2.

Consequently, Craig urges the Court to modify the amount of his restitution or otherwise terminate it, in light of the authority conferred upon it by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664. *Id.* at 3-5.

The government agrees that defendant's offense of conviction, conspiracy to commit bank and wire fraud, falls squarely within the ambit of the MVRA. ECF 315 at 3; *see* ECF 177 (Amended Judgment). According to the government, "the only question is whether the MVRA allows for adjustments to the principal balance of an order of restitution." ECF 315 at 4. In its view, such relief is not available, because the "only statutory basis for reducing a mandatory order of restitution [is] a recovery by the victim in a civil proceeding for the same loss." ECF 315 at 4 (citing *United States v. Alalade*, 204 F.3d 536, 539 (4th Cir. 2000) and 18 U.S.C. § 3664(j)(2)).

As I see it, the government has the better of the argument. The MVRA requires defendants convicted of certain crimes to pay restitution. The ultimate goal of restitution is to compensate a victim fully for his or her loss. Accordingly, 18 U.S.C. § 3663A(a)(1) provides: "[W]hen sentencing a defendant convicted of [certain enumerated offenses], the court shall order . . . that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate." And, 18 U.S.C. § 3664(i) states, in part:

> If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. . . . .

Notably, the MVRA encompasses "an offense against property under this title, . . . including any offense committed by fraud or deceit[.]" 18 U.S.C. § 3663A(c)(1)(A)(ii).   And, in this case, defendant's crime of conviction, conspiracy to commit wire and bank fraud, in violation of 18 U.SC. § 1349, plainly qualifies as an offense against property that involves fraud or deceit. *See United States v. Roper*, 462 F.3d 336, 337-39 (4th Cir. 2006) (finding that the mandatory provisions of the MVRA applied where defendant was convicted of conspiracy to commit bank fraud); *see also United States v. Sullivan*, 234 F. App'x 80, 2007 WL 2032000, at \*1-2 (4th Cir. Jul. 11, 2007) (per curiam) (similar).   Indeed, Craig does not advance any argument to the contrary. Thus, I am persuaded that defendant's conviction subjects him to the provisions of the MVRA.

In accordance with the MVRA, the sentencing court was required to impose an order of restitution commensurate with the loss suffered by the defendant's victims.   Indeed, as the Fourth Circuit explained, "the MVRA mandates that the sentencing court order restitution in the full amount of the victim's loss . . . ." *United States v. Leftwich*, 628 F.3d 665, 668 (4th Cir. 2010). Moreover, "the terms of the MVRA clearly dictate that a district court cannot remit a mandatorily imposed restitution order." *Roper*, 462 F.3d at 338.

Nonetheless, defendant urges the Court to modify or terminate the restitution ordered by Judge Thacker, in light of the authority granted upon it by the MVRA in 18 U.S.C. § 3664(o). ECF 305-1 at 4-5.   But, as the Fourth Circuit has observed, the plain text of the MVRA does not confer any such authority.   *See Roper*, 462 F.3d at 338;  *see also United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003) (observing that the MVRA allows a district court to "mitigate the impact" of a restitution order "only in two respects," namely by "relax[ing] the 'manner' of payment" and "apportion[ing] the payment among defendants if more than one defendant has contributed to the loss") (citing 18 U.S.C. §§ 3664(f), (h) (alteration added).

Indeed, 18 U.S.C. § 3664(o) provides that an order of restitution is a final judgment except that:

(1) such a sentence can subsequently be—

    (A) corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;

    (B) appealed and modified under section 3742;

    (C) amended under subsection (d)(5); or

    (D) adjusted under section 3664(k), 3572, or 3613A; or

(2) the defendant may be resentenced under section 3565 or 3614.

It is not clear on which subsection defendant relies. But, in any event, the provisions do not entitle defendant to the relief he seeks.

The first two exceptions are plainly inapposite. First, Rule 35 of the Federal Rules of Criminal Procedure provides, in relevant part: "Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." But, defendant did not file such a motion within fourteen days of sentencing. Moreover under 18 U.S.C. § 3742, a criminal defendant may file an appeal of a sentence imposed upon him. But, there is no indication that Craig ever attempted to note such an appeal.

Subsection (c) is similarly unhelpful to Craig's argument. It indicates that a court may amend the restitution ordered in accordance with section 3664(d)(5) of Title 18 of the United States Code. It provides, *id.*:

If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted

44

only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

Significantly, the Supreme Court has clarified that the primary purpose of this subsection is "to ensure that victims of a crime receive full restitution." *Dolan v. United States*, 560 U.S.605, 612 (2010). Nonetheless, at least some courts have determined that this subsection, "read together with FRCRP 32(c), does protect a defendant's right to due process by requiring that a defendant be given an opportunity to object within 90 days after sentencing to the amount of restitution ordered." *United States v. Young*, 1:10-cr-00006-TBR-2, 2012 WL 4023773, at *2 (W.D. Ky. Sept. 12, 2012) (citing *United States v. Vandeberg*, 201 F.3d 805, 813-14 (6th Cir. 2000)).[16]

In any case, neither the government nor probation informed the Court that any victims' losses in this case were unascertainable. To the contrary, the PSR reflects an estimated amount of the victims' losses, which were attributable to the conspiracy in which defendant participated. ECF 168, ¶ 30. Moreover, there is no indication that Craig or any victim of the conspiracy petitioned the Court within ninety days of sentencing. Therefore, 18 U.S.C. § 3664(d)(5) cannot afford defendant any relief.

As to the provisions referenced in 18 U.S.C. § 3664(o)(1)(D), including 18 U.S.C. §§ 3572, 3613A, and 3664(k), they do not apply here. Section 3572 merely provides guidance on the factors a court should consider in imposing a fine; it does not confer any authority on the district court to modify the amount of such a fine previously imposed. And, although 18 U.S.C. § 3613A authorizes a court to take certain actions in the event of default by the defendant, including

---

[16] Rule 32 of the Federal Rules of Criminal Procedure is titled "Sentencing and Judgment." And, in subsection (c), it requires that, prior to the imposition of a sentence, the probation officer must "conduct a presentence investigation and submit a report to the court . . . ." Fed. R. Crim. P. 32(c)(1)(A). Where "the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution." Fed. R. Crim. P. 32(c)(1)(B).

modification of the payment schedule, it does not empower a court to modify the amount of restitution ordered.  Nor has Craig defaulted on the payments owed.

As to 18 U.S.C. § 3664(k), it empowers a court to adjust the *payment schedule* of a restitution order where a defendant demonstrates "any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution."  *See also United States v. Banks,* 430 F. App'x 179, 181 (3d Cir. 2011) (per curiam) (noting that a court has limited jurisdiction to entertain a motion under section 3664(k) to modify or adjust a restitution order that "does not encompass an attack on the overall validity of a restitution order.");  *Young,* 2012 WL 4023773, at *2 (noting that a "Court may, under 18 U.S.C. § 3664(k), modify [a] payment plan based on a material change in economic circumstances."). However, § 3664(k) does not permit a court to alter the amount of restitution.  *See Young,* 2012 WL 4023773, at *2; *United States v. Nelson*, No. 03-80712, 2013 WL 3381436, at *2 (E.D. Mich. July 8, 2013).

Nor does 18 U.S.C. § 3664(o)(2) advance defendant's claim.  As mentioned, this subsection provides that a Court may modify an order of restitution pursuant to 18 U.S.C. § 3565 or § 3614. But, these provisions have no bearing here.  Characterized broadly, 18 U.S.C. § 3565 pertains to the revocation or continuation of probation.  And, 18 U.S.C. § 3614 is titled "Resentencing upon failure to pay a fine or restitution".  It indicates that where "a defendant knowingly fails to pay a delinquent fine or restitution the court may resentence the defendant to any sentence which might originally have been imposed" except that "[i]n no event shall a defendant be incarcerated under this section solely on the basis of inability to make payments because the defendant is indigent."  *Id.* §§ 3614(a), (c).  In short, § 3614 does not contemplate the modification of restitution ordered on the basis of the claims asserted here.

Thus, 18 U.S.C. § 3664(o) does not authorize the Court to alter or otherwise modify the amount of restitution previously ordered.  Craig's assertions to  the contrary are wide of the mark.

### B.

Notably, in opposing the Restitution Motion, the government asserts that defendant may not "challenge the statutory basis for the imposition and calculation of his restitution" because he did not note a timely appeal of the Amended Judgment, and more than two years have transpired since defendant was sentenced.     ECF 315 at 3.     Further, the government claims: "[N]onconstitutional claims which could have been raised in an appeal, but were not, may not be raised in collateral proceedings."  *Id.* (citing *United States v. James*, 846 F.2d 75, 1988 WL 41025, at *1 (4th Cir. May 2, 1988) (Table) and *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976)).

Defendant devotes a substantial portion of his reply contending that he should be given the opportunity to appeal the restitution order.  ECF 321 at 4-7.  In making this argument, defendant maintains that he urged his attorney to challenge the viability of the restitution order.  *Id.* at 6. Nevertheless, according to Craig, his counsel declined to do so.  *Id.*  Consequently, he claims that any delay in appealing the amount of restitution should be excused because it was the result of his attorney's ineffective assistance.  *Id.*

As I see it, the assertions are misplaced.  This is because defendant never filed an appeal.[17]

On the other hand, defendant's argument concerning the ineffectiveness of his counsel, read generously, could be construed as a collateral attack on the viability of the restitution order. In particular, defendant maintains that he had previously urged his attorney at trial and on appeal

---

[17] Defendant implies that he previously noted an appeal of his sentence.  *See* ECF 321 at 6 (stating that he "was represented by the same attorney during the appellate stage, with whom represented him at trial").  But, the Docket is devoid of any suggestion that an appeal was filed. *See* Docket.

to challenge the viability of the restitution order.  ECF 321 at 6-7.  Generally speaking, an argument

of this kind implicates 28 U.S.C. § 2255.  *See Massaro v. United States*, 538 U.S. 500, 509 (2003).

This statute provides that a prisoner in federal custody can challenge the viability of his

conviction, but only on specific grounds: "(1) 'that the sentence was imposed in violation of the

Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose

such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4)

that the sentence 'is otherwise subject to collateral attack.'"  *See Hill v. United States*, 368 U.S.

424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see United States v. Hodge*, 902 F.3d 420, 426 (4th

Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*,

612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the petitioner must establish (1) an error of constitutional magnitude; (2) a

sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to

render the entire proceeding invalid.  *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).

And, "an error of law does not provide a basis for collateral attack unless the claimed error

constituted 'a fundamental defect which inherently results in a complete miscarriage of

justice.'"  *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting Hill, 368 U.S. at 428).

The scope of collateral attack under § 2255 is narrower than on appeal, and, as the

government points out (ECF 315 at 3), "'collateral challenge may not do service for an

appeal.'"  *Foster v. Chatman*, 578 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United

States v. Frady*, 456 U.S. 152, 165 (1982)).  In other words, a failure to raise a claim on direct

appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion unless

the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he

complains" or "actual innocence."  *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*,

186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro*, 538 U.S. at 509. Ordinarily, such claims are not litigated on direct appeal. Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also United States v. Ladson*, 793 F. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam). Generally, such claims are litigated in a § 2255 action, to allow for development of the record. *Massaro*, 538 U.S. at 504-06; *Ladson*, 793 F. App'x at 203.

But, petitions for such relief filed pursuant to 28 U.S.C. § 2255 are subject to a one-year statute of limitations. 28 U.S.C. § 2255(f). The one-year clock is triggered by one of four conditions, whichever occurs last, *id.* § 2255(f)(1)-(4):

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Defendant does not assert that the government unlawfully impeded his ability to seek relief, nor does he identify either a retroactive Supreme Court decision applicable to his case or newly discovered, previously unobtainable evidence. Therefore, the Court assumes for present purposes that Craig's one-year clock began to run when his judgment became final.

For the purposes of § 2255(f)(1), a judgment of conviction becomes final upon the conclusion of direct review or expiration of the time for seeking such review. *Clay v. United States*, 537 U.S. 522, 525 (2003). As noted, Craig did not appeal his conviction or sentence. Thus, his judgment became final on February 10, 2020, fourteen days after entry of the Amended Judgment on January 27, 2020. *See* ECF 177; *see also* Fed. R. App. P. 4(b)(1), (b)(6) (providing that a criminal defendant must notice an appeal within 14 days after the judgment is "entered on the criminal docket"); *accord United States v. Osborne*, 452 F. App'x 294, 295-96 (4th Cir. 2011) (per curiam). Accordingly, Craig's window to file a § 2255 motion closed on February 10, 2021.

As noted, defendant contends that any delay on his part should be excused because he requested his attorney to seek a modification or termination of the restitution component of his sentence, but his attorney neglected to do so. ECF 321 at 4-7. To be sure, the one-year statute of limitations for federal habeas review is subject to equitable tolling, which, in effect, excuses the filing of a tardy habeas petition. *Holland v. Florida*, 560 U.S 631, 649 (2010); *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (en banc). Equitable tolling of a petition for collateral review is available when the petitioner demonstrates "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408,

418 (2005)).  Consistent with this framework, the Fourth Circuit has instructed that equitable tolling is appropriate in those "'rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitations period against the party and gross injustice would result.'" *Whiteside*, 775 F.3d at 184 (quoting *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc)).

Defendant's argument does not amount to an extraordinary circumstance that would warrant the equitable tolling of his deadline to file a habeas petition.  Further, crediting defendant's assertions as true, his attorney's determination not to seek a habeas petition on this basis was a prudent one;  as explained below, such an exercise would have been a futile one.

Indeed, assuming, *arguendo*, Craig had filed a timely § 2255 petition, it would have been denied.  This is because "28 U.S.C. § 2255 only entitles prisoners to attack a custodial component of a sentence."  *United States v. Fabian*, 798 F. Supp. 2d 647, 684 (D. Md. 2011).  Thus, as the Fourth Circuit has previously indicated, albeit in an unpublished opinion, "a §2255 motion may not be used for the sole purpose of challenging fines or restitution orders[.]"  *United States v. Hudgins*, 2006 WL 2794412, at *1 (4th Cir. Sept. 25, 2006).  Further, "nearly every other Court of Appeals that has considered the question has concluded that restitution orders cannot be attacked through a § 2255 petition, including those filed when the defendant is incarcerated."  *Fabian*, 798 F. Supp. 2d at 684 (collecting cases); *see also Miller v. United States*, DKC-17-0196, DKC-19-3541, 2021 WL 1139753, at *1 (D. Md. Mar. 25, 2021) (finding the same).  In light of the weight of the foregoing authority, I am persuaded that I may not consider the validity of the restitution order in a challenge arising under 28 U.S.C. § 2255.

Alternatively, defendant's claim could be construed as a petition for relief pursuant to 28 U.S.C. § 2241.  Notably, subsection (a) of § 2241 provides, in relevant part: "Writs of habeas

corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." And, "[s]everal district courts within the Fourth Circuit have noted that it is an open question whether a challenge to the validity or correctness of a restitution order (as opposed to the execution of a restitution order) may be brought in a § 2241 habeas petition." *Keller v. Warden*, 7:20-cv-00540, 2020 WL 5751625, at *1 (W.D. Va. Sept. 25, 2020) (collecting cases); *see Hudgins,* 201 F. App'x at 142 (explaining that a prisoner's § 2255 habeas petition challenging the restitution order on the ground that it improperly delegated the timing and amount of payments to the BOP should have been treated as a § 2241 petition).

But, even assuming such an argument could be made within the context of a § 2241 petition, the claim could not be resolved by this Court. This is because, as the Fourth Circuit has instructed, *In re Jones*, 226 F.3d 328, 332 (4th Cir. 2000): "A habeas petition under § 2241 must . . . be filed in the district in which the prisoner is confined." Moreover, this requirement is a jurisdictional one. *See United States v. Poole*, 531 F.3d 263, 270-71, 274-75 (4th Cir. 2008). And, as mentioned, Craig is currently incarcerated in USP Lewisburg, which is located in Pennsylvania. *See Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed May 13, 2022).

Accordingly, any petition arising under 28 U.S.C. § 2241 must be filed in the District Court for the Middle District of Pennsylvania. This Court is without jurisdiction to hear such a claim.

In sum, the Court lacks any basis from which it could entertain a challenge to the viability of the restitution ordered in this case. Therefore, I shall deny defendant's request to modify or otherwise terminate the restitution ordered.

### C.

Separate from challenging the validity of the restitution ordered, defendant also contends: "Despite the fact that the court ordered [him] to commence restitution payment upon his release

on supervised release, the BOP is NOW compelling him to pay said restitution since his incarceration and he is currently paying such restitution as of date [sic]."  ECF 305-1 at 11. Specifically, he claims that the BOP has "garnish[ed] monthly restitution payments from his institutional trust fund account."  *Id.* at 11-12.

The government counters that this claim is not properly before the Court because, prior to "seeking relief from any court regarding obligations under the inmate financial responsibility program, a defendant must exhaust all administrative remedies through the BOP."  ECF 315 at 5. "Moreover, once all administrative remedies have been exhausted, a defendant's proper recourse is to file the appropriate pleading in the district court located in the <u>district of confinement</u>, not with the sentencing court."  *Id.* (underline in original).

As mentioned above, the Amended Judgment provides that defendant's restitution is due in fully, immediately.  ECF 177 at 6.  But, it also specifies: "No restitution or other financial penalty shall be collected through the Inmate Financial Responsibility Program."  *Id.* (emphasis omitted).  Nonetheless, according to records submitted by defendant, the BOP had garnished $300 from defendant's trust account between May 12, 2021, and October 13, 2021, for payment towards defendant's restitution.  ECF 297 at 3.

Indeed, in the Supplement, the government provides that, as of April 7, 2022, "records from the Clerk of the Court indicate that the BOP had garnished approximately $950 in restitution payments from Mr. Craig's trust account to date," at least a portion of which "has been disbursed to the victims."  ECF 319.  The government indicates: "The USAO is working with the Clerk's Office, the Administrative Office of the Courts, and the Department of Justice to determine if these funds, or any portion thereof, can be reimbursed to Mr. Craig."  *Id.*   And, the government states that the USAO has "consulted with the BOP, and the BOP has indicated that it will no longer

garnish restitution payments from Mr. Craig's trust account." *Id.* Thus, as the government points out,"[t]o the extent that Mr. Craig's motion can be construed as a request to order the BOP to cease its collections," the issue is now moot. *Id.*

However, Craig disputes the government's assertion, claiming that "a thorough review of [his] trust funds records clearly reveals that a total of $1,200.00 in restitution payments has been garnished from [his] account . . . since April, 2020." ECF 323 at 2. Moreover, Craig seeks full reimbursement of the monies that were previously garnished. *See id.* at 3.

Nonetheless, the Court may not consider the merits of the parties' contentions. This is because Craig's claim amounts to a challenge to the execution of the terms of the Amended Judgment. And, arguments regarding "'the execution of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions'" must be brought pursuant to 28 U.S.C. § 2241. *Wise v. Wilson*, 2:17-cv-288, 2018 WL 2348689, at *3 (E.D. Va. Apr. 18, 2018) (quoting *Gonzalez-Martinez v. Drew*, No. 8:11-cv-00437, 2011 WL 6982247, at *4 n.1 (D.C.S. Dec. 16, 2011)), report and recommendation adopted by 2018 WL 2347075 (E.D. Va. May 23, 2018); *see United States v. Little*, 392 F.3d 671, 679-80 (4th Cir. 2004) (stating that a "request for sentencing credit is properly brought under § 2241," even if the basis of the challenge is a constitutional one). Indeed, as the Fourth Circuit has previously explained, a motion challenging "the implementation of the restitution portion of [a defendant's] sentence" should be construed as "a petition for habeas corpus relief arising under 28 U.S.C. § 2241[.]" *United States v. Childs*, 126 F. App'x 96, 97 (4th Cir. 2005) (per curiam).

And, as discussed, a § 2241 petition may not be considered by this Court. Rather, petitions for habeas relief brought under this provision must be filed in the Middle District of Pennsylvania,

the district wherein defendant is currently incarcerated.  *See In re Jones*, 226 F.3d at 332; *see also Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed May 13, 2022).[18]

### D.

Under 28 U.S.C. § 1631, "[w]henever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed . . . ."  But, transfer of an improperly filed petition is not mandatory.  *See United States v. McNeill*, 523 F. App'x 979, 983 (4th Cir. 2013).

Section 2241 does not contain a statutory exhaustion requirement.  But, "courts consistently require prisoners to exhaust administrative remedies prior to seeking habeas review under § 2241."  *Woods v. Warden*, 7:17-cv-00358, 2019 WL 489135, at *2 (W.D. Va. Feb. 7, 2019); *see United States v. Mercado*, 37 F. App'x 698, 699 (4th Cir. 2002) (per curiam) (upholding dismissal for failure to exhaust BOP's administrative remedies prior to filing § 2241 petition); *McClung v. Shearin*, 90 F. App'x 444, 445 (4th Cir. 2004) (per curiam) (similar).  And, defendant failed to exhaust his administrative remedies prior to filing the Restitution Motion.  Therefore, transfer of the Restitution Motion to the Middle District of Pennsylvania is not in the interest of justice, because it would be futile.

---

[18] Notably, 28 U.S.C. § 2241 entitles a petitioner to relief "on any possible claim of sentencing error only if the alleged error is not harmless."  *Hoslett v. Thomas*, 2:10-cv-0406, 2012 WL 3990446, at *7 (E.D. Cal. Sept. 11, 2012).  And, in this case, it is not immediately apparent that defendant has been harmed by the BOP's actions, even if the BOP contravened the payment terms of the Amended Judgment.  It is undisputed that the garnished funds have been dedicated to the restitution that Craig is obligated to pay.  ECF 319; *see* ECF 177.  In other words, the money was applied to Craig's debt.

Therefore,  I shall deny the Restitution Motion, without prejudice to Craig's right to file it in the District Court for the Middle District of Pennsylvania, following the exhaustion of his administrative remedies.

### E.

To the extent that the Restitution Motion should be construed as a habeas petition pursuant to 28 U.S.C. § 2255, Rule 11(a) of the Rules Governing § 2255 Proceedings require the court to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).  In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017).  Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong.  *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

In my view, Craig has not made such a showing.  Therefore, I decline to issue a COA.[19]

---

[19] Where the district court denies a COA, this does not preclude a petitioner from seeking a COA from the appellate court.

## V.      Conclusion

Accordingly, I shall deny defendant's request for the appointment of counsel.  Further, I shall deny the Motion and the Restitution Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: May 13, 2022                                    _____/s/_____
                                                      Ellen L.  Hollander
                                                      United States District Judge